No. 2--96--0946

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE OF   ) Appeal from the Circuit Court

ILLINOIS, ) of Du Page County.

  )

Plaintiff-Appellee,    )  No. 95--CM--636 

)

v. ) 

  )

NANETTE M. STULTS, ) Honorable

 ) George J. Bakalis,

Defendant-Appellant.  )  Judge, Presiding. 

______________________________________________________________

JUSTICE COLWELL delivered the opinion of the court:

Defendant, Nanette M. Stults, appeals her conviction of practicing nursing without a license in violation of the Illinois Nursing Act of 1987 (Nursing Act) (225 ILCS 65/1 
et
 
seq.
 (West 1996)).  On appeal, Stults contends that she should be awarded a new trial because the trial court erroneously sustained an objection at trial.  In the alternative, Stults argues that her conviction should be reversed because (1) she was not proved guilty beyond a reasonable doubt; (2) the provisions of the Nursing Act prohibiting the unlicensed practice of nursing are unconstitutional; and (3) newly discovered evidence demonstrates that the trial court's finding of guilt was erroneous.  We affirm.

The record shows that Stults is an unlicensed medical assistant.  After graduating from high school in Illinois, Stults enrolled in a medical assistant's program at Catholic Medical Academy in Wisconsin.  Upon completing the one-year program, Stults entered an internship in pediatrics.  During her internship, Stults studied anatomy, physiology, X-ray procedures, physical assessment procedures, blood-drawing procedures, and immunization procedures, among other tasks.

After completing her internship, Stults worked in a pediatric clinic located in a medical-surgical clinic in Milwaukee as a "pediatric nurse."  While working at the clinic, Stults enrolled in Marquette University, taking child psychology and infant and toddler nutrition courses.  Upon completing the classes at Marquette, Stults enrolled in a registered nurse (RN) program at Milwaukee Technical College.  Stults completed approximately 20 months of courses before dropping the program "in academic good standing."  At trial, Stults testified that she had to leave the program because her husband worked for the air force and was transferred to California.

Stults returned to Illinois from California in 1973.  In 1980, she started to work for a pediatrician in Downers Grove.  Stults testified that her responsibilities at the Downers Grove office consisted of what she had been doing "years before in pediatric nursing."  The pediatrician Stults worked for in the Downers Grove office left shortly after Stults arrived.  Stults, however, remained working at the office for the new pediatrician, Dr. Koteswara Batchu.  

Stults testified that her duties remained the same while working for Dr. Batchu.  Mainly, she assessed physical measurements of  children and placed the measurements on medical charts.  Stults also administered immunizations to children.

Stults next went to work for Dr. Lynn.  She worked for Dr. Lynn for over 11 years, performing essentially the same duties as she had with Dr. Batchu.  Stults left Dr. Lynn to work for General Pediatrics in June 1991.  Stults stated that she learned about the position at General Pediatrics because General Pediatrics was located one floor below Dr. Lynn's office in the medical center.  Stults said that a nurse in General Pediatrics, Patricia Reidy, talked to her during her lunch hour and asked her to consider working for General Pediatrics.  Stults stated that she never told Reidy that she was a registered nurse and that she never asked Reidy about her credentials.

Stults testified that Dr. Michael Steinken, a doctor at General Pediatrics, called her in May 1991.  Stults stated that he said he "was in desperate need" to fill Reidy's position and asked whether she would take the position.  Stults declined.  Dr. Steinken called Stults again on June 9, 1991.  Dr. Steinken asked whether Stults had reconsidered her position and the two scheduled an interview for the following day.

Stults testified that she met with Dr. Steinken during her lunch hour on June 10.  She said that she brought him her résumé, even though he had not requested one.  Stults stated that during the course of the 30 to 40 minute interview Dr. Steinken never reviewed her résumé, inquired about her qualifications, or asked if she was a RN or a licensed practical nurse (LPN).  Stults then explained that Dr. Steinken and Dr. Lynn communicated with each other regarding her in July 1991.  Shortly after the conversation, Stults went to work for Dr. Steinken at General Pediatrics.

Stults testified that Dr. Steinken's office was not run like any other pediatric office where she had worked.  Stults stated that she performed phone triage and administered immunizations but that she did not have much contact with the children.  Instead, Stults explained that she would accompany Dr. Steinken into a room and Dr. Steinken would then hand her the child's chart and tell her to do an immunization, a respiratory treatment, or take off an umbilical cord that had been left on at the hospital.

Stults testified that she also performed diet counseling over the phone.  She stated that mothers called the clinic and asked questions about formula problems or about switching from formula to solid food.  Stults explained also that she performed blood drawing, which is a "finger stick" where the blood is drawn up from a small capillary tube in the finger.  Stults said that aside from the immunizations and her finger-prick duties, the receptionists performed the same duties as she did in the clinic.

Stults testified that Karen Raak became the business manager of General Pediatrics in August 1994.  Stults testified that her relationship with Raak was, at best, "stormy."  

Stults explained that Raak requested a nurse's license from her around November 8, 1994.   Stults stated that Raak's request for a license was the first request that she had from anyone in General Pediatrics for anything, including malpractice insurance or a CPR card.  Stults testified that when Raak asked her for her license she was shocked and she wondered whether everyone at the clinic had thought that she was a nurse.  Stults said that at that point she was considering resigning because she did not like her job due to its not being hands-on with children, so she told Raak that she was going to resign and that the license did not make any difference.  Stults stated that she did not tell Raak that she had a license or that she would give her the license.

We note that, at trial, Raak's version of events contradicted Stults' testimony.  Raak testified that she requested Stults' nursing license from Stults in September 1994.  Raak said that Stults told her that she would get the license for her.  Raak stated that after two weeks she called Stults again and requested the license and Stults told her that she kept forgetting to bring it and that she would get it for Raak.  Raak repeated this procedure with the same results in the following weeks.  Finally, early in November Raak called Stults and told her that she needed the license because the accountant was going to visit the office.  Raak said that Stults told her that she was quitting but that she would get the license to her.  

Stults then explained that she had been interviewing in the two-week period prior to Raak's asking for her license.  Stults identified an application she filed with the Visiting Nurses Association.  The application is not in the record on appeal.  Stults, however, explained that the application does not state that she is an RN or LPN.  Instead, her résumé indicates that she is a pediatric nurse.

Stults next identified several bills from the clinic's records.  Stults pointed out which handwriting on each of the bills was her own, which handwriting was done by the receptionist, and which handwriting was done by a third person.  Stults acknowledged that on a couple of bills the initials "R.N." appeared after her name.  Stults explained, however, that she never put "R.N." after her name and that, from looking at the bills, all the "R.N." 's were not in her handwriting.  These bills are not in the record on appeal.

On cross-examination, Stults explained that a pediatric nurse and a registered nurse were two different things.  Further, Stults said that Raak's testimony that Stults told her that she would bring her license to her on six occasions is ludicrous because a RN license is the size of a business card and carried alongside a person's CPR card.  Accordingly, it would be ridiculous for her to tell Raak that she would have to go home to get the license.

Laura Angela testified that she worked as a medical receptionist at General Pediatrics between 1989 and 1992.  Angela testified that Stults was hired as a "pediatric assistant" and that it was her understanding that Stults was 
not
 a registered nurse.  Angela added that, during her time working with Stults, Stults never held herself out to be a registered nurse or a pediatric nurse.  Angela testified that she had never seen Stults put the initials "R.N." after her name on a bill or any other document.  On cross-examination, Angela acknowledged that on an application for employment form Stults had written "pediatric nurse" in the line indicating occupation. 

Mary Lou Hagen, an office manager at General Pediatrics, testified also that Stults never held herself out to be a registered nurse, did not wear a name tag indicating she was a registered nurse, did not tell anyone that she was a registered nurse, and did not write the letters "R.N." after her name.

At trial, Dr. Steinken testified to a different version of events regarding Raak's requesting Stults' nursing license. Dr. Steinken stated that he reviewed Stults' résumé during his interview with her and before he hired her.  First, Dr. Steinken said that, although Stults' résumé indicated that she was not a registered nurse and that she had never told him that she was a registered nurse, he had assumed that she was a registered nurse pending receipt of her license.  Dr. Steinken explained that Stults had listed "pediatric nurse" several times on her résumé and that such a description regarding past employment led him to believe that he was hiring someone with some sort of nursing certificate or license.  Dr. Steinken added that in his experience he had never known anyone to call himself or herself a nurse who did not have "some sort of license to practice nursing."

Second, Dr. Steinken testified that Raak requested Stults' license because at the time the office was getting its personnel records in order.  Dr. Steinken acknowledged that he called Stults around November 8 and asked her about her license.  Dr. Steinken stated that Stults told him that she was resigning, but that when he told her that he still needed her license, she said that she would get it for him.

Finally, Dr. Steinken testified that "[t]here can be significant amount of overlap in the functions of a medical assistant with a nurse."  Dr. Steinken then stated, however, that he had never employed a medical assistant; accordingly, he was unfamiliar with the exact tasks that a medical assistant could perform.

Dr. Miroslav Kovacevic testified also as a medical expert concerning the tasks a medical assistant could perform.  Dr. Kovacevic stated that Stults worked for him late in the 1980s as a medical assistant and that she was the only medical assistant that he had ever employed.  Dr. Kovacevic said that registered nurses administer immunizations and perform blood drawing, as well as take physical measurements of the children.  Dr. Kovacevic explained that, as a medical assistant, Stults performed these same activities unsupervised except for immunizations, during which he supervised her.  In explaining what he meant by "supervision," Dr. Kovacevic stated that supervision meant that he filled the needle, told Stults what to do, and then was somewhere in the office while Stults gave the immunization.  Finally, Dr. Kovacevic testified that his interpretation of a pediatric nurse was a registered nurse with special training in pediatrics.

Jacqueline Waggoner testified that she works as the Nursing Act coordinator for the Illinois Department of Professional Regulation.  Waggoner stated that a "pediatric nurse" in Illinois is a registered nurse with a specialty in pediatrics.  Consequently, a person could not be a pediatric nurse without being a registered nurse.

Waggoner then explained which duties Stults performed that could be done only by a registered nurse.  Waggoner stated that registered nurses or licensed practical nurses perform injections of medication, physical assessments, suture removal, and counseling, but that drawing blood is not something that is exclusive to a registered nurse.  

When questioned about the duties that a medical assistant is able to perform without violating the Nursing Act, Waggoner stated 

that she works only with the Nursing Act and is unfamiliar with the Medical Practice Act of 1987 (225 ILCS 60/1 
et seq.
 (West 1996)).  Waggoner explained, however, that physicians were authorized to delegate certain tasks to unlicensed nurses, such as blood drawing.  Waggoner stated that, if the complaint concerning Stults had stated only that Stults, as an unlicensed nurse, was giving immunizations under direct supervision of a physician, her department's stance "probably" would have been that a physician may delegate that duty.  Waggoner continued, however, and stated that injections of medicine, suture removal, physical assessments, and counseling were all tasks that only registered nurses could perform.

The trial court found Stults guilty of the practice of professional nursing without a license.  The court stated that the evidence was clear that Stults "performed duties that are restricted to a nurse, particularly the various types of injections and immunization[s]."  At the sentencing hearing, the trial court added that, although Stults had the "ability and qualifications" to perform the tasks she performed, Illinois law required her to be licensed regarding those tasks.  The trial court explained that, although the doctors involved should have substantiated Stults' credentials, the fact was that Stults performed the tasks of a nurse.  Accordingly, the court sentenced Stults to one year of supervision, a fine of $250, and 60 hours of public service employment.

On appeal, Stults contends that the trial court erred in sustaining the State's objection to a question posed to Waggoner concerning the permissibility of Stults' performing several nursing duties as a medical assistant.  Second, Stults asserts that she was not proved guilty beyond a reasonable doubt.  Third, Stults argues that the provisions of the Nursing Act prohibiting the unlicensed practice of nursing are unconstitutional.  Finally, Stults contends that she is warranted a new trial because of newly discovered evidence.

We turn first to Stults' claim that the trial court erred in sustaining one of the State's objections during her cross-examination of Waggoner.  We note that the State argues that Stults waived this issue by not raising it in her post trial motion.  A review of the record, however, shows that Stults asserted in her post trial motion that the trial court erred in sustaining the State's objections.  Accordingly, we will review whether the trial court's decision was erroneous.

When determining whether a trial court has improperly restricted the scope of cross-examination resulting in reversible error, the test is whether the trial court has clearly abused its discretion such that manifest prejudice results.  
People v. Zarebski
, 186 Ill. App. 3d 285, 291 (1989).  Overall, the assumptions suggested in a hypothetical question need not be undisputed, but only supported by the record.  
Harris v. Day
, 115 Ill. App. 3d 762, 771 (1983).  Indeed, an expert may be cross-examined for the purpose of explaining, modifying, or discrediting his testimony.  
People v. Fields
, 170 Ill. App. 3d 1, 14 (1988).   Stults asserts that the trial court erred in sustaining the State's objection to Stults' asking Waggoner:

"[If] Miss Stults was doing phone triage, under the direct supervision of a physician in that pediatric office, in other words, baby calls--"

Stults argues that, by not allowing Waggoner to answer this question, the court precluded Stults from "eliciting the crucial testimony that would have exonerated her and explained the appropriateness of her conduct."  Specifically, Stults states that Waggoner would have testified that, if Dr. Steinken had delegated the duty of counseling over the phone to Stults, Stults would not have been in violation of the Nursing Act.  

We find that the trial court did not abuse its discretion in sustaining the State's objection to Stults' question concerning the phone counseling.  First, we note that, in the beginning of Waggoner's testimony, Waggoner responded that her department oversees the Nursing Act and that she did not have knowledge of what medical assistants were allowed to do.  Accordingly, Waggoner was admittedly an expert witness only on the Nursing Act and not on medical assistants.  Therefore, her opinion of which tasks Stults could have performed as a medical assistant--even if supervised--is given little, if any, weight.

Second, a look at the trial transcript shows that, although the trial court sustained the State's objection to this question, the preceding questions and the following questions elicited Waggoner's opinion regarding Stults' ability to counsel over the phone.  For example, before Stults asked the question at issue, Waggoner explained that, although the supervised injections "probably" were not a problem, it was a "bigger picture" than that because of all the other activities, such as suture removal, physicals, and phone counseling, that Stults was performing.  Consequently, Stults was able to elicit from Waggoner that, although giving injections 
may
 not be a problem for supervised nonnurses, other activities, such as phone counseling, were activities performed by nurses.

Then, after the trial court sustained the State's objection, Stults asked:

"If you were to have evidence *** that an individual who was not a nurse was taking phone calls from mothers about their sick children and was giving them advice, would that be considered nursing?"

In response, Waggoner stated that in such a case she would assume that the individual taking the phone calls had substantial knowledge that had been "obtained in the nursing education program."

After this response, Stults asked Waggoner whether her opinion would change if the person taking the phone calls was a medical assistant.  Waggoner replied that her opinion would not change because a medical assistant does not have the "nursing knowledge and background" to deal with treatment protocol.  Accordingly, Stults was able to ask Waggoner whether a medical assistant was able to perform telephone counseling, and Waggoner replied no.   

We find that, overall, Stults' questions elicited responses by Waggoner that demonstrated that the tasks performed by Stults were nursing activities--which is the issue in the case.  Therefore, as the record demonstrates that Stults had the opportunity to make the trial court aware of the factors concerning the relevant issue in the case, the trial court's sustaining the State's objection on this question was not an abuse of discretion.  See 
People v. Maldonado
, 193 Ill. App. 3d 1062, 1069 (1989) (when determining the constitutional sufficiency of cross-examination, this court looks not to what a defendant had been prohibited from doing, but what she had been allowed to do).   

Turning to Stults' second contention, Stults asserts that she was not proved guilty beyond a reasonable doubt.  It is the trier of fact's function to determine the accused's guilt or innocence, and this court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt.  
People v. Frieberg
, 147 Ill. 2d 326, 359 (1992).  Indeed, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Frieberg
, 147 Ill. 2d at 360.  
Only where the record leaves the reviewing court with a grave and substantial doubt of guilt should the conviction be reversed.  
People v. Mendoza
, 208 Ill. App. 3d 183, 204 (1991).

We find sufficient evidence in the record for the trial court to have found Stults guilty of violating the Nursing Act.  In her brief, Stults maintains that the evidence shows that everything she did was under the supervision of Dr. Steinken.  Stults states that the record indicates that Dr. Steinken had the authority to delegate certain duties to her and, as a medical assistant, she was "empowered" to perform those functions.  We disagree.

Whether Stults performed her duties while properly supervised is not the issue in this case.  Instead, the issue in this case is whether the duties Stults performed are nursing activities limited to RNs and LPNs as defined by the Nursing Act.  Pursuant to the Nursing Act, only licensed nurses may perform certain activities.  See 225 ILCS 65/4 (West 1996).  The State presented evidence through Waggoner that the activities that Stults performed were these "nursing activities."  Accordingly, whether Stults was supervised or whether Dr. Steinken delegated the duties she performed is irrelevant.  The only relevant inquiry is whether Stults performed nursing acts.

Stults continually asserts that medical assistants are allowed to perform many of the same functions as nurses.  Indeed, Stults places great emphasis on her being a medical assistant.  Stults claims that medical assistants may perform duties considered to be nursing activities as long as the duties are delegated by physicians and are supervised.  Consequently, Stults argues that, since the State did not prove that Stults performed her duties without adequate supervision, she cannot be convicted of violating the Nursing Act.   

We find no Illinois statute that defines what a medical assistant is or designates what functions a medical assistant is able to perform.  In fact, we find nothing in the Medical Practice Act of 1987 (225 ILCS 60/1 
et
 
seq.
 (West 1996)) or the Nursing Act that recognizes "medical assistants."  Consequently, Stults' argument that Illinois law permits medical assistants to perform some of the same functions as nurses is without support.

Contrary to Stults' belief, this court does not believe that the legislature's failure to define medical assistant and designate duties a medical assistant may perform is merely an oversight.  Instead, a look at several statutes reveals that the legislature considered the roles an assistant may have in various contexts.  For example, section 15(b)(2) of the Dietetic and Nutrition Services Practices Act (225 ILCS 30/15(b)(2) (West 1996)) indicates that a dietician may assign a dietary technical support person certain duties, and the Illinois Dental Practice Act (see 225 ILCS 25/1 
et seq.
 (West 1996)) states that a dentist may employ a dental assistant.   

The Illinois Occupational Therapy Practice Act (225 ILCS 75/1 
et seq.
 (West 1996))  provides also that an occupational therapy assistant may practice occupational therapy upon meeting certain criteria.  See 225 ILCS 75/9 
 (West 1996).  Similarly, the Illinois Physical Therapy Act (225 ILCS 90/1 
et seq.
 (West 1996)) defines a "physical therapist assistant" and states that such assistants may perform certain functions under the general supervision of a licensed physical therapist.  See 225 ILCS 90/1(9), 2(7) (West 1996).  In addition, the Illinois Optometric Practice Act of 1987 (225 ILCS 80/1 
et seq.
 (West 1996)) indicates that an optometric assistant may perform functions under the supervision of a licensed optometrist.  See 225 ILCS 80/3(a)(8) (West 1996).  

Finally, we note that the Physician Assistant Practice Act of 1987 (225 ILCS 95/1 
et seq.
 (West 1996)) states that the practice of a physician assistant will enable physicians "to delegate certain health tasks to physician assistants where such delegation is consistent with the health and welfare of the patient and is conducted at the direction of and under the responsible supervision of the physician."  225 ILCS 95/1 (West 1996).  The statute then provides details concerning applications for licenses and certification.  See 225 ILCS 95/9, 10 (West 1996).

From reviewing these and other statutes, we find that the legislature carefully provided for assistants to medical personnel where it deemed assistants were warranted.  Several of these statutes provide great detail in outlining exactly what functions an assistant may perform (see 225 ILCS 25/17(g) (West 1996)), and some require that the assistants obtain special licenses (225 ILCS 95/9 (West 1996)).  Moreover, we note that, although Stults does not claim that a medical assistant is equal to a physician assistant, the record reveals that Stults' qualifications are more similar to those of a physician assistant than a nurse. Accordingly, we find that if the legislature intended for medical assistants to perform some of the same functions as nurses, it would have done so.  See 
Schaumburg State Bank v. Bank of Wheaton
, 197 Ill. App. 3d 713, 720 (1990) (it is presumed that statutes that relate to the same subject are governed by a single policy).  Therefore, because no statute provides that medical assistants may perform some of the same functions as nurses, Stults' performing the various nursing duties, even as a medical assistant, was in violation of the Nursing Act.

Stults' third contention concerns the constitutionality of the Nursing Act.  Stults claims first that the Nursing Act's provisions that prohibit the practice of nursing are unconstitutionally vague as applied to her.  To prevail on a vagueness challenge, a party must demonstrate that the statute is vague as applied to the conduct for which the party is being prosecuted.  
People v. Jihan
, 127 Ill. 2d 379, 385 (1989).  Moreover, the party must show that the statute did not provide clear notice that the party's conduct is prohibited.  
Jihan
, 127 Ill. 2d at 385.  Overall, definiteness is necessary so that " 'the person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly.' "  
Jihan
, 127 Ill. 2d at 385, quoting 
Grayned v. City of Rockford
, 408 U.S. 104, 108, 33 L. Ed. 2d 222, 227, 92 S. Ct. 2294, 2298-99 (1972).

In this case, Stults contends that the Nursing Act is vague because it does not provide that giving injections, administering immunizations, and conducting phone counseling are nursing acts that are prohibited.  We disagree.

According to the Nursing Act, professional nursing includes:

"[A]ll its specialties, and means the performance for compensation of any nursing act, (1) in the nursing evaluation, observation, care, and 
counsel
 of the ill, injured, or infirmed; (2) in the maintenance of health or prevention of illness of others; (3) the 
administration of medications and treatments
 as prescribed by a licensed physician, dentist, or podiatrist; or (4) any act in the supervision or teaching of nursing, which requires substantial, specialized judgment and skill the proper performance of which is based on knowledge and application of the principles of biological, physical, and social science acquired by means of a completed course in an approved school of professional nursing."  (Emphasis added.)  225 ILCS 65/3(
l
) (West 1996).   

We find that this provision is not unconstitutionally vague as it applies to Stults.  Indeed, Stults' argument that she did not know what constitutes a nursing activity is directly contrary to her actions in the 20 years preceding the trial.  For example, Stults acknowledged that she listed "pediatric nurse" on her résumé regarding her previous positions of employment--not medical assistant.  Consequently, Stults had some idea that the tasks and functions she had been performing were "nursing" activities. 

Second, we find that section 3 of the Nursing Act, which indicates that acts involving the evaluation, treatment, counseling, and administration of medication, gives adequate notice of what duties a person without a nursing license is unable to perform.  There is nothing vague about any of those words.  A person without a nursing license may not evaluate, treat, or counsel the ill, infirmed, or injured and may not administer medication to others.

Stults depends on her being a medical assistant and her belief that medical assistants may perform some of the same duties as nurses in support of her argument that this provision of the Nursing Act is vague.  We reiterate, however, that there is no Illinois statute regarding the duties that medical assistants may perform.  Consequently, there is no conflict between the duties of a nurse and a medical assistant and no reason for the legislature to provide explicit details of what constitutes a "nursing act" as opposed to an "act that can be performed by a medical assistant."  See 
Potts v. Illinois Department of Registration & Education
, 128 Ill. 2d 322, 333 (1989) (the State has a substantial interest in promoting the general welfare and whether the course chosen by the legislature to achieve a desired result is either wise or the best means available is not a proper subject of judicial inquiry). Instead, we find that the Nursing Act's stating that only nurses may evaluate, treat, and counsel others and administer medication is definite enough to give Stults notice of what activities are prohibited by an individual without a nursing license.

Stults next challenges the constitutionality of the Nursing Act provisions that prohibit the unlicensed practice of nursing on the basis that these provisions are overly broad as applied to her.  A statute is constitutionally overly broad if it may be reasonably interpreted to prohibit conduct which is constitutionally protected.  
People v. Smith
, 245 Ill. App. 3d 712, 719 (1993).

Stults maintains that the Nursing Act is overly broad because it prohibits 
all
 individuals from performing certain procedures except licensed nurses.  Stults claims that under the provisions of the Nursing Act 
even physicians are prohibited from performing nursing activities.  Consequently, the Nursing Act must be deemed unconstitutionally overly broad.  

We find that the Nursing Act is not overly broad as applied to Stults.  Specifically, we find Stults' argument that the Nursing Act precludes physicians from performing nursing duties is without merit.  According to section 4(
l
), the Nursing Act does not prohibit anyone licensed in Illinois under any other act from performing duties for which he or she is licensed.  Consequently, as Illinois requires physicians to be licensed, a physician may perform a nursing act.  Further, any other type of assistant, such as a physician assistant, if properly licensed, would not be prohibited from performing nursing activities if those same activities were part of his or her licensed practice.  See 225 ILCS 65/4(
l
) (West 1996).  Therefore, Stults' argument that the Nursing Act is overly broad because it prohibits all individuals except nurses from performing certain actions is erroneous.

Finally, Stults contends that her conviction must be reversed because of newly discovered evidence.  A defendant should receive a new trial based on newly discovered evidence only if three requirements are met.  First, the defendant must show that the evidence must be of such a conclusive character that it will probably change the result upon retrial.  Second, the defendant must show that the evidence is material to the issue and not merely cumulative.  Finally, the defendant must show that the evidence was discovered after the trial and could not have been discoverable before the trial through the exercise of due diligence.  
People v. DeCesare
, 190 Ill. App. 3d 934, 943 (1989).

In this case, Stults argues that an affidavit by a director of the American Association of Medical Assistants stating that Stults had the authority to perform certain nursing activities warrants a new trial.  The trial court denied Stults' motion on the basis that the director's opinion is irrelevant because there is no Illinois statute defining a medical assistant.  

We agree with the trial court that the affidavit does not warrant a new trial.  Particularly, we find that Stults cannot meet the third requirement regarding newly discovered evidence.  Stults' only explanation for the affidavit's not being at trial is that it was "not available."  Accordingly, Stults has not met her burden of showing that through the exercise of due diligence the newly discovered evidence could not have been discovered before the trial concluded.  See 
People v. Cunningham
, 267 Ill. App. 3d 1009, 1018 (1994).

Further, the affidavit is not of such a conclusive character that it would change the outcome of the trial.  On the contrary, we agree with the trial court that the issue in this case concerns Illinois law and what Illinois law says regarding the tasks a medical assistant can perform.  An affidavit that does not consider Illinois law or explain what a medical assistant is in Illinois is irrelevant to the case.  Therefore, the trial court properly denied the defendant's motion for a new trial.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

THOMAS and RATHJE, JJ., concur.